RMT:MEL
F. #2016R02100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

MIMI OULD BABA,
    also known as, "Oumar A. Yanya,"

        Defendant.

- - - - - - - - - - - - -X

<u>COMPLAINT AND
AFFIDAVIT IN
SUPPORT OF
ARREST WARRANT</u>

(18 U.S.C. §§ 2332(a)(1), 2339B,
2 and 3551 <u>et</u> <u>seq</u>.)

EASTERN DISTRICT OF NEW YORK, SS:

    KYLE JOHNSON, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

COUNT ONE
Murder of Michael J. Riddering

    On or about January 15, 2016, within the extraterritorial jurisdiction of the United States, the defendant MIMI OULD BABA, also known as "Oumar A. Yanya," together with others, did knowingly, intentionally and with malice aforethought kill Michael J. Riddering, a national of the United States, while such national was outside the United States, which killing was a murder as defined in Title 18, United States Code, Section 1111(a).

    (Title 18, United States Code, Sections 2332(a)(1), 2 and 3551 <u>et</u> <u>seq</u>.)

## COUNT TWO
### Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization

In or about and between December 2015 and March 2016, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendant MIMI OULD BABA, also known as "Oumar A. Yanya," together with others, did knowingly and intentionally conspire to provide material support and resources, as defined in 18 U.S.C. § 2339A(b), including personnel, including himself, services and property, to a foreign terrorist organization, to wit: (1) al-Qaeda in the Islamic Maghreb ("AQIM"), which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act; and (2) al-Murabitoun, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act.

(Title 18, United States Code, Sections 2339B(a)(1) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been assigned to the New York Joint Terrorism Task Force ("JTTF") for more than three years. During my tenure with the FBI, I have participated in numerous investigations

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, some of the communications referenced in this Complaint reflect draft translations of statements originally made in Arabic and are subject to revision. Unless otherwise indicated all statements attributed to the defendant or any other individual are in sum, substance and part. Social media posts, messages and other electronic communications quoted herein have not been edited to correct grammatical and/or spelling errors.

involving terrorists and foreign terrorist organizations, during the course of which I have, among other things, conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants and used other investigative techniques to secure relevant information. I am familiar with the facts and circumstances set forth below from my participation in the investigation and from reports of other law enforcement officers involved in the investigation.

### A. AQIM and al-Murabitoun

2. From in or about 1989, up to and including the date of the filing of this application, al-Qaeda has been an international terrorist group that is dedicated to opposing non-Islamic governments with force and violence. Usama Bin Laden ("Bin Laden") was the leader or "emir" of al-Qaeda until his death on May 2, 2011. Following Bin Laden's death, Ayman al-Zawahiri ("al-Zawahiri") – who had previously served as a senior associate of Bin Laden and later as the deputy leader of al-Qaeda – assumed the role of al-Qaeda's emir. Al-Zawahiri remains al-Qaeda's emir to this date. Members of al-Qaeda typically have pledged an oath of allegiance (called a "bayat") to Bin Laden and al-Qaeda.

3. The core purpose of al-Qaeda, as stated by Bin Laden and other al-Qaeda leaders, is to leverage violent attacks against property and nationals, both military and civilian, of the United States and other Western countries to drive U.S. forces from Islamic countries, including Saudi Arabia and Somalia, and to eliminate American support for the governments of other Islamic countries. Between 1989 and 2001, al-Qaeda established training camps, guest houses and business operations in Afghanistan, Pakistan and other countries for the purpose of training and supporting its agenda of violence and murder. Members and associates of al-Qaeda, both known and unknown, have executed a number of

terrorist attacks all in furtherance of the organization's stated goal to kill Americans, including the September 11, 2001 attacks in New York, Virginia and Pennsylvania, which killed approximately 2,976 people.

4. Al-Qaeda functions both on its own and through various terrorist organizations that operate under al-Qaeda's umbrella. One of those organizations is AQIM. AQIM is a terrorist organization operating in North and West Africa. AQIM formerly called itself the Salafist Group for Preaching and Combat ("GSPC"). The GSPC was founded in the late 1990s with the assistance of Bin Laden, and it declared war on Algeria's secular authorities and on Western targets. On or about September 11, 2006, Ayman al-Zawahiri issued a videotaped statement. Among other things, Zawahiri said: "Usama Bin Laden has told me to announce to Muslims that the GSPC has joined al-Qaeda." Soon thereafter, the GSPC issued a statement indicating that it had changed its name on Bin Laden's "orders." The GSPC's new name was AQIM. Subsequently, the leader of AQIM publicly said: "We [AQIM] and al-Qaeda are one body."

5. AQIM has conducted numerous terrorist operations, including guerrilla-style ambushes; mortar, rocket and IED attacks; kidnapping-for-ransom operations; and small-arms attacks against locations that are frequented by Westerners. For example, in December 2008, in Niger, AQIM kidnapped two Western diplomats who were working as part of a United Nations mission; AQIM held the two victims for approximately four months in the desert before releasing them in Mali. In June 2009, the group publicly claimed responsibility for killing a U.S. citizen in Mauritania for his missionary activities. In 2011, AQIM killed two French hostages during an attempted rescue operation in Niger.

6. Mokhtar Belmokhtar was a leader of an AQIM subgroup operating in the Sahel. In or about December 2012, Belmokhtar announced the formation of a new battalion, al-Murabitoun, which is also known as "Al-Muwaqqi'un bil-Dima" or "Those Who Sign in Blood." In the announcement, Belmokhtar stated that the emir of the new battalion was Zawahiri, establishing that the group was loyal to and a branch of al-Qaeda. In 2015, al-Murabitoun merged with AQIM to conduct several high profile attacks.

7. On or about December 5, 2001, the Secretary of State designated AQIM, then known as the Salafist Group for Call and Combat, as a Terrorist Exclusion List organization under section 212 of the Immigration and Nationality Act, as amended by the USA PATRIOT Act. On or about February 4, 2008, the Secretary of State amended the designation of AQIM as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224 to include the name al-Qa'ida in the Islamic Maghreb. The Secretary also added the following aliases to the FTO listing: AQIM and Tanzim al-Qa'ida fi Bilad al-Maghrib al-Islamiya. To date, AQIM remains a designated FTO.

8. On or about December 18, 2013, the Secretary of State designated the al-Mulathamun Battalion as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. The Secretary also added the following aliases to the FTO listing for al-Mulathamun Battalion: the "Those Who Sign in Blood" battalion and "al-Murabitoun." To date, al-Murabitoun remains a designated FTO.

B. <u>2016 Attacks in Burkina Faso and Cote d'Ivoire</u>

9. On or about January 15, 2016 at approximately 7:30 p.m., three men armed with AK-47 assault rifles and hand grenades attacked the Splendid Hotel and Café Cappuccino in Ouagadougou, Burkina Faso. The attack lasted until approximately 7:00 a.m. the next morning and resulted in the deaths of 30 people, including American citizen Michael James Riddering. Riddering was eating dinner at Café Cappuccino when two of the attackers entered the restaurant and fired AK-47s at the patrons. Riddering was shot multiple times and died at the scene as a result of the gunshot wounds. All three attackers were ultimately killed. On or about January 16, 2016, AQIM issued a public statement claiming responsibility for the attacks on behalf of AQIM and al-Murabitoun. The statement included photographs of the three attackers along with their war names.

10. Less than two months later, on or about March 13, 2016, three men armed with AK-47s and hand grenades attacked resort patrons located in Grand Bassam, Cote d'Ivoire. The attackers walked along the beach firing at individuals. The attack resulted in the death of 19 people. All three attackers were killed. On or about March 14, 2016, AQIM issued a public statement claiming responsibility for the attack. On or about March 16, 2016, another statement was issued with the photographs of the three attackers along with their war names.

C. <u>BABA's Role in the Attacks</u>

11. The defendant MIMI OULD BABA, also known as "Oumar A. Yanya," ("BABA") is a 32-year-old citizen of Mali.

12. In or about January 2017, BABA was captured in northern Mali and taken into Malian custody. On or about March 13 and March 15, 2017, agents with the JTTF

conducted an interview of BABA in Mali with the assistance of a French and Arabic linguist. BABA, after waiving his Miranda rights, provided the following information.

13. BABA stated that, in approximately 2016, the operations chief of al-Murabitoun ("CC-1"), using an intermediary ("CC-2"), summoned BABA to a meeting in Mali. The following day, BABA and CC-2 were driven to a meeting location, where they met with CC-1 and another individual. At the meeting, CC-1 asked BABA to assist in planning a terrorist attack in Burkina Faso. CC-1 wanted BABA's assistance because BABA was familiar with Burkina Faso. Initially, CC-1 described BABA's "work" as traveling to Burkina Faso with CC-2 to scout restaurants and hotels in Ouagadougou frequented by "white people." At the conclusion of the meeting, BABA was given one or two million West African CFA francs ("CFA"), the equivalent of approximately $1,500 to $3,000 U.S. dollars, for expenses. BABA stated that he knew that he was working for al-Qaeda when he accepted the assignment. BABA further stated that he did not consider himself a jihadist but was willing to assist al-Qaeda for monetary reasons.

14. BABA and CC-2 travelled to Ouagadougou by bus. The two stayed at a small hotel near the airport that BABA was familiar with from previous visits. BABA also stated that the hotel was not far from the Café Cappuccino.

15. BABA directed CC-2 to restaurants in Ouagadougou that he knew Westerners, i.e., "white people," would frequent. Later, BABA discovered that CC-2 was discreetly using his Samsung phone to take surveillance pictures and videos of the restaurants and hotels considered potential target locations. Several restaurants were scouted by BABA and CC-2.

16. After completing the surveillance of the potential targets in Ouagadougou, BABA and CC-2 returned to Gao, Mali by bus. Upon their arrival in Gao, CC-2 called CC-1. Someone other than CC-1 answered CC-1's phone. The individual indicated that they would call BABA and CC-2 back in two days with further instructions. Two days later, they received a call from someone on behalf of CC-1. That person instructed BABA and CC-2 to meet CC-1 in the "bush" area near Tabankort, Mali. BABA and CC-2 attended the meeting in the designated location. BABA, CC-1, CC-2 and four other individuals attended the meeting. The purpose of the meeting was to discuss the results of BABA and CC-2's trip to conduct surveillance in Ouagadougou. The group reviewed the surveillance videos taken by CC-2. While viewing the videos, the group assessed the exterior security at each location and discussed each potential target. After viewing all the videos and discussing each potential target location, CC-1 chose Café Cappuccino and Hotel Splendid as the final targets because they were in close proximity to each other.

17. Once the targets were chosen, the attack planning began. At the close of the meeting, CC-1 pulled BABA aside for a private conversation. CC-1 warned BABA that, since BABA was a new member of the group, BABA would be blamed if information regarding the attack was leaked. CC-1 warned BABA that BABA's family would be in jeopardy if BABA betrayed the plan and the group. CC-1 ordered BABA to return to Gao and wait for CC-2 to contact him with further instructions.

18. CC-2 returned to Gao with a white Helix pickup truck, handing the truck over to BABA. Present with BABA for the delivery of the truck was another individual ("CC-3"). The truck had counterfeit Togo license plates. The truck had a large truck tire

secured in the rear bed of the Helix.  Secreted within the tire were the weapons to be used for the attack.  The weapons included fully assembled Kalashnikovs assault rifles ("AK-47"), ammunition, magazines, eight to ten brownish, pineapple-style hand grenades and tan tactical vests.  Although the weapons were already sealed in the tire prior to delivery, BABA knew the tire contained the weapons.  During this meeting, CC-2 discussed the details of the operation with BABA and CC-3.  CC-2 gave BABA one million CFA, approximately $1,500 U.S. dollars, for expenses in order to facilitate the attack.  CC-2 instructed BABA to take the tire to Ouagadougou, rent a safe house and inform CC-2 when the tire was delivered.  After CC-2 departed, BABA directed CC-3 to take the tire to Ouagadougou.  BABA provided CC-3 with the telephone number of one of BABA's friends in Ouagadougou.  BABA told CC-3 that the friend would assist CC-3 with the safe house rental.   CC-3 departed for Ouagadougou with the tire via a for-hire vehicle.  CC-3 arrived in Ouagadougou with the tire, transiting through Boni, Mali.  Upon arrival, CC-3 informed BABA that he had rented a safe house.  BABA informed CC-2 that the tire containing the weapons for the terrorist attack arrived safely in Ouagadougou and that the safe house was available for use.

        19.    CC-2, on behalf of CC-1, met with BABA in Gao to go over the next phase of the operation.  CC-2 provided BABA with a black Honda pickup truck with counterfeit Togo license plates.  CC-2 also arrived with the three suicide attackers assigned to carry out the mission.  CC-2 instructed BABA to drive the three suicide operatives to the Ouagadougou safe house.  BABA described the operatives as being very young, possibly 16 years old, each carrying Malian ID cards.  BABA indicated that one of the three was a light-skinned Malian and that they all spoke Peul, a West African tribal dialect.  CC-2 also provided BABA with a mobile phone for use during the operation.

20. BABA, along with the three suicide operatives, crossed the Malian border and arrived in Ouagadougou. Upon entering the safe house, they were greeted by CC-2 and CC-3. The entire group immediately started to discuss the attack plans. CC-2 asked CC-3 about the tire, and CC-3 informed him that the tire was safe and that it was hidden with a "marabout."[2] BABA, CC-2 and the three attackers retrieved the tire and opened it at a discreet, deserted location. All the weapons, AK-47s, grenades and tactical vests were retrieved from the tire and transported to the safe house.

21. After securing the weapons at the safe house, BABA and CC-2 brought the three suicide operatives for a final walk-through of the attack target locations before the actual operation. The distance from the safe house to the attack site is approximately 4-5 kilometers. During the pre-attack walk-through, CC-2 instructed the operatives on how the attack was to take place. CC-2 also encouraged the operatives, explaining that they were going to be considered martyrs and would soon be in paradise for conducting the operation. CC-2 further stated that they were not to be taken captive. CC-2 instructed two of the operatives – the "light skinned one" and the "tall one" – to start the attack at the Cafe Cappuccino. CC-2 instructed the "short one" to skip the cafe and proceed directly to Hotel Splendid. This operative was instructed to proceed immediately to the hotel security post and kill the guard. After killing the guard, this operative was to continue into the hotel and kill as many people as possible. The two operatives designated to the café were instructed to kill as many people as possible at the café, and then proceed to the hotel, linking up with the hotel operative, all continuing the attack until they were killed.

---

[2] In West Africa, the term "marabout" refers to a Muslim religious leader or teacher.

22. BABA, CC-2 and the three operatives returned to the safe house. The following day, prior to the attack, CC-2 departed Ouagadougou for Gao, Mali by bus, and CC-3 departed for Djibo, Burkina Faso by bus. BABA told CC-3 to wait for BABA's arrival in Djibo. While at the house, the three suicide operatives put on the tactical vests and began to arm themselves in preparation for the attack. They put on long coats to conceal their weapons for the drive to the attack site. The three attackers entered BABA's vehicle so that BABA could transport them to the vicinity of Café Cappuccino for the start the attack. During the ride, BABA heard the three attackers praying, asking that they become martyrs quickly.

23. The drive took approximately 15 minutes and BABA dropped the three attackers off behind Café Cappuccino and immediately departed. After delivering the fully armed suicide operatives to the Café Cappuccino, BABA immediately fled toward Mali. BABA stopped only when he arrived in Djibo, Burkina Faso. At Djibo, BABA met up with CC-3 and the two continued on to Boni, Mali in BABA's vehicle. BABA remained in Boni until he was contacted by CC-2 and summoned to Gao, Mali. CC-3 remained in Boni while BABA took the bus to Gao, per CC-2's instructions.

24. Upon arrival in Gao, BABA was summoned to a meeting with CC-1. The meeting location, in the bush near Tabankort, was near the original attack-planning meeting site. CC-1 and another individual were at the meeting. They informed BABA that the attack at Café Cappuccino and Hotel Splendid was a great success and that the three attackers were now martyrs. CC-1 congratulated BABA for his role in the operation and told him that due to his success they wanted BABA to plan another attack against "white people." CC-1 told BABA that he would like to conduct the next operation in either Mali, Senegal or

Cote d'Ivoire. BABA explained to CC-1 that he refused to be involved in an attack in Mali because all of BABA's family lived in Mali. BABA further stated that CC-1 could have "cut [BABA's] head off" for refusing, but BABA told CC-1 that he had no problem assisting with an attack in Senegal or Cote d'Ivoire. BABA also explained to CC-1 that he wanted a less "hands-on role" and would contract out some of the travel and surveillance work. BABA told CC-1 that he had another individual ("CC-4") in mind to assist. BABA knew CC-4 from working together in Boni.

25. According to BABA, CC-4 traveled to Cote d'Ivoire numerous times and was very familiar with that region. BABA knew that CC-4 had always been interested in terrorism and considered CC-4 to be a jihadist. BABA contacted CC-4 and informed him that he needed him for a job and directed him to a location near Tabankort for a meeting. BABA, CC-2, CC-3 and CC-4 met with CC-1 at the Tabankort meeting location. Baba introduced CC-4 to CC-1, explaining that CC-4 was familiar with Cote d'Ivoire. CC-1 instructed CC-4 that he was to travel to Abidjan, Cote d'Ivoire with CC-3 and identify all possible target locations frequented by Westerners. BABA drove CC-4 and CC-3 to the bus station, giving them one million CFA for expenses, which CC-1 had provided to BABA. BABA received a phone call from CC-2 informing him that CC-3 and CC-4 identified a possible attack target in Abidjan. CC-2 told BABA that CC-2 was going to look at the location himself and determine if it was a good target.

26. BABA had a friend who put him in touch with another individual ("CC-5"), who had a vehicle with two gas tanks, one of which was empty and could be used as a hidden compartment. Baba contacted CC-5 and asked CC-5 if he could borrow the vehicle with the hidden compartment. CC-5 agreed. The vehicle with the hidden compartment was

Case 1:20-mj-00056-RER   Document 1   Filed 01/15/20   Page 13 of 16 PageID #: 13

13

brought to Gao. While the vehicle was in Gao, all the weapons designated for use in the Abidjan attack were secured in the hidden compartment by CC-2. CC-5 then drove the vehicle to Bamako, Mali where a driver known to BABA as "Mahane" was hired to deliver the vehicle to Cote d'Ivoire. Upon arriving in Abidjan, Mahane turned the vehicle over to CC-3. CC-3 then called BABA, informing him the vehicle had been delivered. Mahane returned to Bamako via bus.

27. BABA received a phone call from CC-4 requesting that BABA contact CC-4's relative, who would assist in identifying three males who would be willing to conduct a suicide attack. After the three attackers were identified, they were brought to CC-1 to receive instructions. After the suicide operatives were given their instructions by CC-1, CC-2 delivered them to BABA in Gao. BABA knew the three were going to conduct an attack in Cote d'Ivoire, but he did not know the exact target location. On the day of the attack in Cote d'Ivoire, CC-3 and CC-4 told BABA that the attack was a success and that the attackers were handed the weapons on the beach before starting the attack.

D. Additional Evidence

    a. Ouagadougou Attack

28. As detailed above, BABA described staying in a small hotel near the airport when he was in Ouagadougou to scout attack locations. An agent from the FBI travelled to Ouagadougou and visited the Villa Assikpo, a small hotel in Ouagadougou. Villa Assikpo is at the location described by BABA during his interview as the location where he stayed. In addition, the agent was able to view and take photographs of the guestbook at the Villa Assikpo. In the guestbook, there was an entry for an individual named "Oumar A.

Yanya," who arrived on December 20, 2015 and left on or about December 25, 2015.[3] Yanya is listed as being born in Gao, Mali in 1988, the same year of birth and place of birth as BABA. He stated in the guestbook that he had travelled from Bamako to Ouagadougou. Based on my training and experience and involvement in the investigation, I believe that this is the entry from when BABA visited the hotel.

29. Based on the information provided in BABA's interview, the agent further identified the safe house where BABA, CC-3 and the attackers stayed prior to the attack. CC-3 was renting the house at the time of the attack. During the interview with the FBI, BABA described the safe house as being approximately 4-5 kilometers from the attack site. He further described the house as having a big empty lot in front of it. The location and description of the safe house identified by law enforcement is consistent with this information provided by BABA. In addition, Burkinabe law enforcement officials seized a truck tire from the safe house, which is believed to be the truck tire used to transport the weapons to Ouagadougou for the attack.

30. Evidence obtained from the scene of the Ouagadougou attack reflects that the attack occurred as CC-2 instructed the attackers in BABA's presence as BABA conveyed to the FBI in his interview. For example, an individual in a security guard uniform was found dead near the entrance of Hotel Splendid. In addition, surveillance video from Hotel Splendid shows that one attacker arrived at the hotel first before the other two attackers

---

[3] When BABA spoke to law enforcement, he stated that he believed he had used his true name when he checked into the hotel. However, there was not an entry under the name "Mimi Ould Baba."

arrived, which is consistent with the instructions provided to the attackers as described by BABA in his interview.

### b. Grand Bassam Attack

31. Through the course of the investigation, law enforcement officials identified a Facebook account that appeared to be used by CC-3. Records obtained pursuant to subpoena show that the account was created on July 1, 2015. Publically available photographs for the account show photographs that appear to be CC-3. In addition, records obtained pursuant to a subpoena show that on or about February 5, 2016, an individual logged into the account from an IP address associated with Bamako, Mali. Between February 12 and March 5, 2016, during the time CC-3 was in Cote d'Ivoire conducting surveillance, there were five additional logins to the account and each of these logins was from an IP address associated with Cote d'Ivoire. On or about March 22, 2016, approximately one week after the attack, an individual logged into the account from an IP address in Bamako, Mali. In addition, a search warrant for the account showed that on February 23, 2016, CC-3 posted a new profile picture to the account from an IP address in Cote d'Ivoire. The photograph, which appears to have been taken by another person, shows CC-3 lying on a beach in front of the ocean. The beach appears similar to the beach where the attack occurred on or about March 13, 2016.

32. Ivoirian law enforcement officials also seized a white Toyota Land Cruiser in Cote d'Ivoire after that attack. The vehicle has two gas tanks, one of which had been modified for storage. Law enforcement officials found cloth and foam in the modified gas tank when it was seized. The vehicle is registered to CC-5.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant MIMI OULD BABA, also known as "Oumar A. Yanya," and that he be dealt with according to law.

_____
KYLE JOHNSON
Special Agent, Federal Bureau of Investigation

Sworn to before me this
15th day of January, 2020

_____
THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK